IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JOHNNY BATES and | * | |
| PATRICIA MIDDLETON BATES, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | CIVIL ACTION FILE |
| v. | * | |
| | * | NO. 1-09-CV-03280-AT |
| MICHELIN NORTH AMERICA, INC., | * | |
| | * | |
| Defendant. | * | |

## REDACTED VERSION

## PLAINTIFFS' RESPONSE TO MICHELIN NORTH AMERICA INC.'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

When you are driving down the interstate in unremarkable fashion, your tire

should not spontaneously, and catastrophically, come apart. Yet that is what

happened to Johnny and Patricia Bates. The simplicity of the defect gets lost in the

clutter of Michelin's Motion. Johnny Bates was driving at the speed limit with

both hands on the wheel when his tire separated without warning. That should not

have happened, particularly where (1) Michelin inspected the subject tire during its

manufacture, then allowed it to leave the plant even though it did not meet

Michelin's own "tolerance limits"; (2) Michelin knew that the flaws in the subject

tire constituted defects; (3) Michelin made a calculated decision to invest less time and money into each Uniroyal tire; (4) Michelin knew that belted tires without nylon cap plies "frequently fail[ed]," yet refused to add a nylon cap to the subject tire; and (5) Michelin had real-world evidence that tread separations were occurring, yet did nothing. These circumstances demonstrate Michelin's "conscious indifference to the consequences" and necessitate denial of its motion for summary judgment as to punitive damages.

## I.    FACTS

### A.    Wreck

On Christmas Day, 2008, Johnny and Patricia Bates drove through Fairburn, Georgia in their white SUV. (P. Bates dep. at 161, attached as Ex. 1.) They had left their home in Alabama at 7:00 that morning and were driving north to spend the holiday with Patricia's daughter in Duluth, Georgia. (*Id.* at 161-62, 164.) With the radio off and no phones in use, the vehicle was quiet as Johnny drove through the early afternoon at the speed limit with both hands on the steering wheel. (*Id.* at 174; Buchner dep. at 98, attached as Ex. 2.)

There had been no funny noises, no odd shakes, and no impacts from road hazards, but without warning there was a "glump, glump, glump" from the left rear. (P. Bates dep. at 166-67, 170, 237. Ex. 1.) Johnny kept his hands on the

wheel. (*Id.* at 174.) Black tire debris filled the road behind the vehicle as the left rear tire came apart. (T. Stanley dep. at 11, attached as Ex. 3.) The vehicle started shaking. (P. Bates dep. at 171, Ex. 1.) Patricia watched in silence as Johnny fought for control. *Id.* at 174-75. The tire went "baloomp, baloomp, baloomp." (*Id.* at 171.) The vehicle began to veer. (*Id.*) Johnny lost control. (*Id.* at 174-75.) The vehicle rolled over. (*Id.* at 176.) It rolled several times and finally came to rest on its wheels. (V. Stanley dep. at 8, attached as Ex. 4.)

When the vehicle stopped rolling, Patricia had sustained injuries to her legs and neck. (P. Bates dep. at 177-79, Ex. 1.) She looked at her husband. Johnny's scalp was "off." (*Id.* at 181.) Blood covered his body. (*Id.*) He told Patricia he thought his arm was broken. (*Id.*) Then Johnny became quiet. "He just had this stare in his eyes. He didn't speak anymore after that." (*Id.*)

Johnny is now a permanent quadriplegic with significant brain injuries.

## B.   Tire

Examination of the left rear tire—"the subject tire"—revealed a litany of defects that explain its failure and that were known to Michelin. There was trapped air between layers in the tire, which made the layers more likely to separate. (Cottles rpt. at 20, 21, attached as Ex. 5; Cottles dep. at 150, attached as Ex. 6.) Much of the tire's rubber had oxidized, meaning that it could not adhere

3

properly to the surrounding rubber. (Cottles rpt. at 20-21, Ex. 5; Cottles dep. at 142, Ex. 6.) The internal steel belts were improperly snaked and scalloped. (Cottles rpt. at 22, 33, Ex. 5.) A belt splice was dangerously overlapped. (Cottles rpt. at 23, 33, Ex. 5; Cottles aff. at ¶ 15, attached as Ex. 7.) The wires and cables in the tire were irregularly spaced and had other problems. (Cottles rpt. at 20-24, Ex. 5.) In short, the tire was defective under Michelin's own standards—but Michelin sold it anyway. (Cottles aff. at 13, 15, 17, Ex. 7.)

## II.    STANDARD OF REVIEW

"In evaluating a motion for summary judgment under Rule 56(c), the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 850 (11th Cir. 2000) (citation omitted). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

A jury is authorized to impose punitive damages where the evidence shows "conscious indifference to consequences." O.C.G.A. § 51-12-5.1. "[P]unitive damages is usually a matter for the jury." *Woodard v. Ford Motor Co.*, 2007 WL 4125519, *4 (N.D. Ga. 2007) (citation omitted).

4

### III. BY MICHLEIN'S OWN RULES, THIS TIRE NEVER SHOULD HAVE LEFT THE PLANT.

In September 2011, and only at the Court's direction, Michelin finally produced its reaction limits and tolerance limits. The  REDACTED  describe the maximum amount by which a tire can deviate from its specifications before the tire must be scrapped. (MNA 8779, attached as Ex. 8; 9637-39, attached as Ex. 9.)[1] It was soon apparent why Michelin fought production for so long—*the subject tire failed to meet the tolerance limits*. It failed in two ways: first, the tire contained an overlapped belt splice, and second, it contained trapped air.

Evidence surrounding the failure of the subject tire to meet the tolerance limits—*alone*—shows Michelin's "conscious indifference to consequences": (1) Michelin knew that the Ardmore plant was producing tires with the two above-mentioned abnormalities; (2) despite this knowledge, Michelin manufactured the subject tire with those abnormalities *outside its own tolerance limits*; (3) Michelin knew those abnormalities constituted defects; (4) Michelin thoroughly inspected the subject tire during its manufacturing process, as Michelin has admitted; and (5) Michelin should have scrapped the tire after the inspection, as its own internal

---

[1] Since Plaintiffs' Second Motion for Sanctions is still pending, it is worth pointing out that every Michelin document with a bates number of "**MNA 8648**" or higher was produced *on July 19, 2011 or after*—i.e., well after the Court imposed attorneys' fee sanctions. As the Court will note as it reads this Response, Michelin withheld nearly all probative documents yet produced until after that date.

documents demanded.  Instead, Michelin sold the tire.  That conscious decision authorizes the jury to impose punitive damages.

## A.   Overlapped Belt Splice

### 1.   *Michelin knew that its manufacturing process was producing overlapped belt splices.*

Former Michelin employee Joh Mann worked in the Ardmore plant from 1988 to 2004 (i.e., the period when this tire was manufactured).  (Mann aff. ¶ 2, attached as Ex. 10.)  When she left Michelin in 2004, Mann had authority over *hundreds of tire builders*.  (*Id.*)  She testified by affidavit that:

> When a steel belt was rolled onto a tire, the belt was *often* spliced incorrectly.  Instead of creating a butt splice, tire builders *often* let one end of the belt overlap the other.  Leaving an overlapping splice on a steel belt was a bad manufacturing practice.

(*Id.* at ¶ 10) (emphasis added).  Plaintiffs' evidence thus establishes that *overlapped belts splices were common*, and that Michelin knew it

### 2.   *Overlapped belt splices violated Michelin's tolerance limits.*

Michelin's tolerance limits permitted belt splices in which the belt ends abutted smoothly, or where there was a gap of  REDACTED       between the belt ends.  (MNA 9658, Ex. 9; Cottles aff. at ¶ 14, Ex. 7.)  But the belt splice in the subject tire *overlapped*.  Because the splice overlapped, *it violated Michelin's own tolerance limits.*  (*Id.* at ¶ 15.)

6

3. *Michelin knew that overlapped belt splices constituted defects.*

Michelin's internal document

REDACTED

(MNA 8847,

attached as Ex. 11.) (emphasis in original). Other internal documents instruct

workers to reject materials with                    REDACTED

(MNA 8675, attached as

Ex. 12.) Michelin used a machine called an        REDACTED          that was

supposed to *shut down the tire building process* upon detection of an overlapped

splice. (MNA 8688, attached as Ex. 13.). ***Michelin's own FMEA***[2]

REDACTED              (MNA 9248,

attached as Ex. 14.) (emphasis added). In sum, Michelin's internal documents

show that an overlapped belt splice constitutes a defect, and that Michelin knew it.

4. *Michelin inspected the subject tire and therefore had knowledge of its defects.*

Michelin has touted its inspection process, admitting *in judicio* that each tire

was checked "inside and out" before it left the tire building department, that tires

were checked for "every parameter of uniformity," and that tires were "inspected

using x-rays." (Michelin's Br. at 6-7, Doc. 205.) This evidence of Michelin's

---

[2] "Failure Modes and Effects Analysis."

7

inspection procedures, and the whistleblower testimony establishing the commonality of overlapped belt splices, *authorizes the jury to conclude that Michelin knew it was producing tires with overlapped belt splices and that this tire contained such a splice.*

      *5.*    *Michelin should have scrapped the subject tire.*

Michelin's own documents indicate

REDACTED

Michelin's decision to sell the tire despite knowledge of the overlapped belt splice, and its knowledge that an overlapped belt splice constituted a defect, authorizes the jury to impose punitive damages.

**B.**    **Trapped Air**

      *1.*    *Michelin knew that its manufacturing process was producing trapped air.*

Testimony from whistleblowers indicates that Michelin had notice of trapped air in its tires. As Michelin's FMEA indicate,

                REDACTED             (MNA 9261, Ex.

14.)      REDACTED             (MNA 8675, Ex. 12.)

REDACTED                        ); *accord* (Cottles rpt. 31-32, Ex. 5.)  There is

abundant whistleblower testimony about insufficiently tacky rubber at the Ardmore

plant.  Ms. Mann testified that insufficiently tacky rubber necessitated the use of

"gas," which constituted a "bad manufacturing process" but made rubber tackier.

(Mann aff. at ¶ 12, Ex. 10.)  Former Ardmore tire builder Lisa Harris also testified

about using "gas" and explained that it was used "to make the rubber . . . more

sticky, more tacky."  (Lisa Harris stmt. at 3, 11 (sworn statement), attached as Ex.

15.)  Like Mann, Harris testified that Michelin knew about the use of gas at the

Ardmore plant.  (*Id.* at 13-14.)  Additionally, Harris testified that Michelin

sometimes provided her with rubber that was "not tacky," that she rejected the

material, *and that Michelin told her that "it needed to be used anyway because that*

*was all we had."*  (*Id.* at 9-10.) (emphasis added); (*accord* Mann aff. at ¶ 13, Ex.

10.) (recounting reuse of rejected rubber).  Clearly, Michelin had notice that the

rubber at the Ardmore plant was often insufficiently tacky, and—

REDACTED                                  (MNA

9261, Ex. 14.)  As Michelin's own documents and former employees establish,

therefore, Michelin knew about the trapped air problem.

        *2.*     *Trapped air violated Michelin's tolerance limits.*

Trapped air in a tire is dangerous, as Michelin knows.  For that reason,

Michelin did not promulgate a tolerance limit for trapped air—i.e., no amount of trapped air was permissible. (*See* MNA 9634-58, Ex. 9; Cottles aff. at ¶ 16, Ex. 7.) The subject tire, however, had trapped air throughout. (*Id.* at ¶ 17.) Because the tolerance limits set no permissible amount of trapped air, the abundant trapped air in the subject tire violated the tolerance limits. (*Id.*)

     3.    *Michelin knew trapped air was a defect.*

Michelin's internal                REDACTED

                          (MNA 8710, Ex. 16.) Inspectors should   REDACTED         (MNA 8764, attached as Ex. 17.) Tires should contain  REDACTED      (MNA 8780, Ex. 8.) ***Michelin's own FMEA indicate that***                 REDACTED

     (MNA 9261, Ex. 14.) (emphasis added). As Michelin admitted at the sanctions hearing, *"if there's trapped air in a tire, it should be scrapped."* (9/19 Hr'g Tr. at 197, attached as Ex. 18.) (Helm testimony) (emphasis added).

     4.    *Michelin inspected the subject tire and therefore had knowledge of its defects.*

As noted above, Michelin has admitted *in judicio* that it examined each tire "inside and out," that it checked for "every parameter of uniformity," and that it used x-rays to inspect its tires. (Michelin's Br. at 6-7, Doc. 205.) This evidence of Michelin's inspections, combined with the abundant evidence of insufficiently

tacky rubber (which led to trapped air, as Michelin has acknowledged), authorizes the jury to conclude that *Michelin knew it was producing tires with trapped air and that this tire contained trapped air*.

>   5.   *Michelin should have scrapped the subject tire.*

Michelin's internal documents demand that tires with trapped air be scrapped.                    REDACTED

(MNA 8776 (quiz),

8779-80 (answer), Ex. 8.)  Because trapped air constitutes a     REDACTED condition, *tires containing it must be scrapped.*  (MNA 8677, Ex. 12; *accord* MNA 9638, Ex. 9.)  Michelin's decision to sell the tire despite knowledge of the trapped air, and its knowledge that trapped air constituted a defect, authorizes the jury to impose punitive damages.

## IV.   MICHELIN KNEW THAT THE OTHER MANUFACTURING FLAWS IN THE SUBJECT TIRE CONSTITUTED DEFECTS.

An overlapped belt splice and trapped air were not the only ways in which the subject tire was defective—merely the ways in which it violated the tolerance limits. (Cottles aff. ¶ 18, Ex. 7.)  The tire had other flaws that, as Michelin knew, constituted defects:

- The subject tire exhibits irregular internal wire spacing. (Cottles rpt. 20, 22-

24, 33, Ex. 5.)  Michelin's internal documents          REDACTED

(MNA 8780, Ex. 8; accord MNA 8931,

attached as Ex. 19.) (

REDACTED

- The subject tire exhibits overlapped wire ends.  (Cottles rpt. 23, Ex. 5.)

Michelin has acknowledged that                          REDACTED

(MNA 9247, Ex. 14; accord MNA 8718, Ex. 16

REDACTED                          ; MNA 8931, Ex. 19.)

- The subject tire exhibits snaking belts.  (Cottles rpt. 33, 38, Ex. 5.)

Michelin's internal documents                          REDACTED

(MNA 9215, attached as Ex. 20.)  Michelin's own engineers

have admitted that *tire expansion leads to tread separation*.  (Patrick dep. at

162, collectively attached as Ex. 21.)

## V.   MICHELIN MADE A CALCULATED DECISION TO INVEST LESS TIME AND MONEY IN EACH UNIROYAL TIRE.

The Ardmore plant produced both Uniroyal-branded and Michelin-branded

tires, but "Michelin and Uniroyal tires were not treated the same." (Mann aff. at ¶

11, Ex. 10.)  "Tire builders making Michelin tires were more closely scrutinized

than tire builders making Uniroyal tires." (*Id.*)  "The Michelin tire building

machines also had quality-control equipment that the Uniroyal machines didn't have." (*Id.*)

For Uniroyal tires, the emphasis was on quantity, not quality. (Deavors stmt. at 17 (sworn statement), attached as Ex. 22; *accord* Mann aff. at ¶ 5, Ex. 10.) In particular, builders of Uniroyal tires were paid by the tire—the more tires they made, the more they got paid. (*Id.*) "Tire builders had a quota of tires to build, which led to some issues with tire quality because tire builders were trying to build as many tires as possible." (*Id.*)

Once Michelin purchased the Ardmore plant in the 1990s, tire builders who had learned their craft under Uniroyal were surprised at the changes. "[Michelin] wanted more production with less manpower." (Harris stmt. at 26, Ex. 15.) Michelin insisted that machines that had previously been operated by three people be operated by one or two people. (*Id.* at 26-27.) Machines that had been operated by two people had to be operated by one person. (*Id.* at 27.) "They seemed like they wanted more—more tires, regardless of how you got them." (*Id.*)

In sum, the jury will be authorized to find that when Michelin bought the Ardmore plant, Michelin made a calculated decision to produce more Uniroyal tires with less manpower by investing less time and money into each tire. The jury will be authorized to conclude that the predictable, inevitable, and known result of

13

that decision was diminished tire quality.  The jury will be authorized to find that

Michelin made that decision with "conscious indifference to the consequences."

*"Under Georgia law, any automobile manufacturer placing profit over safety*

*risks punitive damages liability*."  *Woodard*, 2007 WL 4125519 at \*4; *accord*

*Mascarenas v. Cooper Tire & Rubber Co.*, 643 F. Supp. 2d 1363, 1374 (S.D. Ga.

2009); *Ford Motor Co. v. Stubblefield*, 171 Ga. App. 331, 341 (1984) ("conscious

decisions to defer implementation of safety devices in order to protect its profits"

support punitive damages).  In short, Michelin made a business decision to

increase profits by investing less in each tire.  No statute or regulation forbade that

decision, but if a jury finds that Michelin made it with "conscious indifference to

the consequences," the jurors have a right to consider punitive damages.

Lisa Harris, who had worked at the Ardmore plant since 1984—back into

the Uniroyal days—put it this way:

> [Y]ou wanted to build a quality tire, you really do, but it was hard to
> continue to keep the quality as high as it needed to be with the pace
> that they wanted you to set, and, I mean, I personally had a one—I
> was one person on a two person machine, second stage, and I had a
> quota that I had to reach, 450 tires everyday on an eight hour shift.
> That's a tire every minute and a half.  You can't do a whole lot of
> quality in a minute and a half.

(Harris stmt. at 27, Ex. 15.)

14

## VI.   MICHELIN KNEW THAT ADDING A NYLON CAP PLY WOULD PREVENT TREAD SEPARATIONS, BUT REFUSED TO ADD ONE.

Evidence authorizes the conclusion that Michelin decided to omit a nylon cap ply from the subject tire with "conscious indifference to the consequences": (1) a nylon cap ply would have prevented tread separations, (2) Michelin *knew* that a nylon cap ply would prevent tread separations, and that belted tires without such cap plies *"frequently fail,"* (3) although including a nylon cap ply was feasible, Michelin refused to do it.

### A.   Nylon cap plies prevent tread separations.

Nylon cap plies prevent tread separations.  (Cottles rpt. at 14, 34-35, 39, Ex. 5.)  They work this way: as a tire rotates, centrifugal forces cause tire expansion (sometimes called tire "growth").  (*Id.* at 14, 35.)  If the tire expands (or grows) too much, the steel belts or tread may separate from the tire carcass.  (*Id.* at 35.)  A nylon cap restricts tire growth and holds the belts in place.  (*Id.*)

### B.   Michelin knew that nylon cap plies prevented tread separations.

Despite Michelin's representations to the contrary, Michelin's internal documents, own engineers, and own patents prove that Michelin knew that nylon caps prevented tread separations.  Michelin's internal documents

REDACTED

(MNA 8819, attached as Ex. 23; *see*

*also* MNA 9218, Ex. 20.)  Further, Michelin's engineers *have expressly acknowledged* that growth causes tread separations: Michelin engineer Charles Patrick testified that "growth" means "[e]xpansion," and that "you can have excessive growth, and that can lead to it [i.e., a tread separation]." (Patrick dep. at 162, Ex. 21.)  In sum, *Michelin knew that nylon caps prevented excessive tire growth and tread separations*.

Michelin's internal documents expressly acknowledge that nylon caps are critical to REDACTED      (i.e., preventing tread separations).  The FMEA show that                              REDACTED

(MNA 9259-60, Ex. 14.)[3]

*As early as 1977*, Uniroyal's patents (and therefore Michelin's patents) acknowledged that belted tires without cap plies "frequently fail":

> *It is known* that tires of the type mentioned above, i.e., tires having a tread reinforced by a belt or breaker composed of superposed, mutually crossed, rubberized plies of parallel, essentially inextensible cords or cables, *__frequently fail because separations occur__* in the shoulder zones of the tires where the edges of the belt plies are severely flexed as the tire tread moves into and out of contact with the road during each revolution *and becomes detached from the surrounding rubber*.

(U.S. Patent 4,062,393 Dec. 13, 1977 (Uniroyal), at col. 1, collectively attached as

---

[3] Michelin uses the French acronym "BAZ" to refer to a nylon cap ply. (*See* MNA 8819, Ex. 23.) (establishing that "BAZ" refers to such a cap ply).

Ex. 24.) (emphasis added)

Not only did Uniroyal (and therefore Michelin) know that belted tires without cap plies "frequently fail," *they knew that cap plies would fix the problem.* A Uniroyal patent *from 1974* establishes that "textile cords" would "restrain[] belt ply separation due to radially outward movement of said metal cords under centrifugal forces." (U.S. Patent 3,850,219 Nov. 26, 1974 (Uniroyal), at col.3, Ex. 24.) Another Uniroyal patent establishes that the purpose of a cap ply is "[t]o protect against separation of the edges of the belt," and "to prevent any separations arising between said belt-like member and carcass." (U.S. Patent No. 4,724,881 Feb. 16, 1988 (Uniroyal), at col. 1, 4, Ex. 24.) Another acknowledges that cap plies offered "improved resistance to ply separation" and provided "high resistance to belt ply edge separation." (U.S. Patent 4,062,393, at abstract, col. 2, Ex. 24.)

C.    **Although installing a nylon cap ply was feasible, Michelin chose not to do it.**

Michelin could have added a nylon cap ply to the subject tire. Other light truck tires manufactured by Uniroyal as early as 1989 had nylon caps. (Patrick dep. at 114, Ex. 21.) Michelin was using nylon caps in light truck tires in the 1980s. (*Id.*) Many of the tires that Michelin sold in Europe included nylon caps. (*Id.* at 118-20.) As early as 1974, Uniroyal had written: "It might be noted that belted radial ply tires having an additional band of textile cords overlying the belt

17

are known in the art." (U.S. Patent 3,850,219, at col. 2, Ex. 24.) Adding a nylon cap to the subject tire was feasible.

In sum, Michelin knew that nylon cap plies prevented tread separations; knew that installing nylon caps was feasible; and knew that without cap plies, belted tires would *"frequently fail."* Nevertheless, Michelin decided not to add such a cap ply. That decision authorizes punitive damages. *Stubblefield*, 171 Ga. App. at 341 ("conscious decisions to defer implementation of safety devices in order to protect its profits" support punitive damages).

## VII. MICHELIN HAD REAL-WORLD EVIDENCE THAT TREAD SEPARATIONS WERE OCCURRING, YET DID NOTHING.

Uniroyal Laredo tires were experiencing hundreds of tread separations, *Michelin knew about it*, and Michelin did nothing. That evidence authorizes punitive damages.

Michelin learned about the separations of its Uniroyal Laredo tires through customer complaints, lawsuits, and its own adjustment data. Through customer complaints alone, Michelin learned of *one hundred and fourteen* Laredo tires that had separated. (MNA 4287-88 (chart), attached as Ex. 25); MNA 4290-4341

(claim forms), attached as Ex. 26.)[4]  There are at least *thirteen* filed court cases

dealing with tread separations in Uniroyal Laredo tires. (Cottles dep. Ex. 28;

MNA 0053-0103, 4889-5321.)

Michelin learned about the lion's share of real-world tread separations,

however, through its own adjustment data (which, as the Court recalls, it fought

hard to withhold in discovery).  When plaintiffs sought adjustment data for tread

separations, Michelin produced only adjustment data for returned tires that had

been assigned Michelin's Adjustment Code 115—i.e., the adjustment code for tires

REDACTED                                    (*See* MNA 6299 (Code 115),

attached as Ex. 27.)  The resulting document showed that at least *one hundred and*

*seventy-four* Uniroyal Laredo tires had experienced tread separations and had been

returned to Michelin dealers.  Michelin had indisputable notice of every single one.

(MNA 9328, attached as Ex. 28.)

Plaintiffs sought a fuller response, and with the Court's intervention, got it.

Plaintiffs sought adjustment data for additional codes.  In addition to Code 115,

plaintiffs sought adjustment data for, *inter alia*, Code 117          REDACTED

, Code 125          REDACTED

---

[4] Only three names in the chart also appear in the stack of claim forms, meaning
that the chart and claim forms collectively contain 114 unique tread separations of
which Michelin had notice.  MNA 4287-88, Ex. 25, 4290-4341, Ex. 26.

REDACTED                    ), and Code 402      REDACTED

. (*See* MNA 6300, 6303, 6406 (above-described codes),

collectively attached as Ex. 29.)  The data Michelin produced in response to the

Court's Order compelling production[5] revealed *eight hundred and sixty-four* more

tires that had failed and been returned to Michelin dealers.  (MNA 9329, attached

as Ex. 30.)

In sum, the Laredo tires had serious problems, and Michelin knew it.

## VIII. MICHELIN'S ARUGMENTS LACK MERIT.

Michelin makes four nonmeritorious arguments: (1) compliance with

FMVSS 109 precludes punitive damages, (2) other similar incidents are

inadmissible, (3) whistleblower testimony is inadmissible, and (4) punitive

damages are unconstitutional.  These arguments fail.

### A.    Compliance with FMVSS 109 does not preclude punitive damages.

Michelin argues that compliance with an outdated and expressly "minimum"

federal standard, FMVSS 109, immunizes it from punitive damages.  Georgia law

is abundantly clear: it does not.  *Gen. Motors Corp. v. Moseley*, 213 Ga. App. 875,

885 (1994) *abrogated on other grounds by* 269 Ga. 191 (punitive damages are

---

[5] Because of the delay in producing some of the adjustment conditions with codes,
pictures, and descriptions, this production of adjustment data also included data
pertaining to codes about which plaintiffs did *not* ask.

appropriate where, "notwithstanding the compliance with applicable safety regulations [i.e., the FMVSS], there is other evidence showing culpable behavior"); *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1217 (11th Cir. 1999) (quoting *Moseley*); *Woodard*, 2007 WL 4125519 at \*4 (punitive damages appropriate despite compliance with FMVSS); *Reid v. BMW of N. Am.*, 430 F. Supp. 2d 1365, 1374 (N.D. Ga. 2006) (same); *Mascarenas*, 643 F. Supp. 2d at 1374 (same).  The "clear and convincing" standard does not change this result. *Woodard*, 2007 WL 4125519, at \*4; *Reid*, 430 F. Supp. 2d at 1374; *Mascarenas*, 643 F. Supp. 2d at 1374.

*Ivy v. Ford Motor Co.*, cited by Michelin, is distinguishable.  646 F.3d 769 (11th Cir. 2011).  In *Ivy*, the vehicle at issue had "passed Ford's internal testing," the vehicle had "received a recommendation in *Consumer Reports*," and the plaintiff had adduced no evidence in support of wantonness save "an after-the-fact opinion of her expert." *Id.* at 777.  Here, the subject tire did not meet Michelin's internal tolerance limits, the tire received no recommendation from *Consumer Reports*, and plaintiffs have adduced abundant evidence beyond an after-the-fact expert opinion (including internal documents, FMEA, whistleblower testimony, admissions from Michelin's engineer, and patents). *Ivy* is inapposite.

Furthermore, FMVSS 109 was designed in 1967 to apply to "bias" tires.

21

(Kam rpt. at 7, attached as Ex. 31.) When NHTSA essentially replaced the standard with FMVSS 139 in 2007, NHTSA described FMVSS 109 as "outdated" and inapplicable to modern "radial" tires like the subject tire. *Id.*; 68 Fed. Reg. at 38119. Put simply, compliance with FMVSS 109 means nothing when applied to a radial tire like the subject tire.

### B.  Other similar incidents are admissible.

Other similar incidents—e.g., other tread separations—are admissible upon a showing of substantial similarity as long as they are not too remote in time. *Hessen for Use & Benefit of Allstate Ins. Co. v. Jaguar Cars, Inc.*, 915 F.2d 641, 650 (11th Cir. 1990) (affirming admission of other-similar-incidents evidence in a product liability case); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 661-62 (11th Cir. 1988) (same); *Reid v. BMW of N. Am.*, 464 F. Supp. 2d 1267, 1271 (N.D. Ga. 2006) (admitting such evidence). Here, that showing of substantial similarity has been met. All of the other similar incidents cited above involved Uniroyal Laredo tires. All of those tires were made at the Ardmore, Oklahoma plant. All indisputably provided notice to Michelin. With the exception of some tires included in the eight hundred and sixty-four tires for which Michelin provided adjustment data in MNA 9329 (because some of the requested adjustment codes did not directly involve delaminations), all experienced tread separations. (*See* Ex.

30.) Substantial similarity has been shown. *Reid*, 464 F. Supp. 2d at 1272.
Additionally, Plaintiffs will provide a showing to the Court of the substantial
similarity of each of these incidents prior to trial as the law requires.

Michelin argues that other similar incidents occurring after the manufacture
of the subject tire are inadmissible. That is incorrect. In this circuit, "[e]vidence of
similar occurrences may be offered to show a defendant's notice of a particular
defect or danger, the magnitude of the defect or danger involved, the defendant's
ability to correct a known defect, the lack of safety for intended uses, the strength
of a product, the standard of care, and causation." *Hessen*, 915 F.2d at 650.
Because of the many purposes for which other similar incidents may be admitted,
subsequent incidents are not only admissible, but relevant to punitive damages. *In
re Mentor Corp. ObTape Transobturator Sling Products Liab. Litig.*, 4:08-MD-
2004, 2010 WL 1962943 at *1, *1 n.2 (M.D. Ga. May 14, 2010) ("Having now
conducted independent research on the issue, the Court finds that Plaintiff's
counsel was correct. . . . The Court can conceive of no reason why this principle
would not apply to *subsequent* occurrences as long as they satisfy the 'substantial
similarity' test. . . . The Court also notes that such evidence may be admissible on
the issue of punitive damages.") (emphasis in original).

Michelin cites *Cooper Tire & Rubber Co. v. Crosby*, 273 Ga. 454, 455

23

(2001). That case does nothing more than apply the substantial similarity test, which, as noted above, is satisfied. Nonetheless, *Crosby* is inapplicable because federal law controls the introduction of other similar incident evidence. *Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1396 (11th Cir. 1997); *Reid*, 464 F. Supp. 2d at 1271 (expressly noting that *Crosby* is inapplicable).

### C.    Whistleblower testimony is admissible.

Michelin asks the Court to rely upon Michelin's evidence regarding its manufacturing processes—i.e., Glazener and Patrick's testimony—but disregard plaintiffs' whistleblower testimony about the deficiencies in those same processes. That is the *exact opposite* of what courts do on summary judgment. At this stage, the Court should credit the whistleblowers and "disregard" Glazener and Patrick. *Reeves*, 530 U.S. at 151.

Where whistleblowers have relevant personal knowledge, their testimony is admissible and relevant to punitive damages. *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1288-89 (2d Cir. 1990) (jury properly relied on whistleblower testimony in asbestos case to impose punitive damages); *Cooper Tire & Rubber Co. v. Tuckier*, 826 So. 2d 679, 683-86 (Miss. 2002) (same in tire case); *see also Firestone Tire & Rubber Co. v. Adams*, 541 A.2d 567, 572-73 (Del. 1988) (same, but punitive damages not at issue). Joh Mann, Lisa Harris, and Buddy Deavors—the

whistleblowers relied upon in this motion—all worked in the Ardmore plant in 2000, the year Michelin manufactured the subject tire, and therefore have personal knowledge of Michelin's manufacturing practices at that time. (Mann aff. ¶ 2, Ex. 10; Harris stmt. at 3, Ex. 15; Deavors stmt. at 3, Ex. 22.)  Their sworn testimony is relevant and admissible.

### D.    Punitive damages are constitutional.

Michelin's argument to the contrary just takes up space.  *Woodard*; 2007 WL 4125519, at *5 (collecting cases).

## IX.   CONCLUSION

Where evidence permits the conclusion that a defendant acted with "conscious indifference to consequences," a jury has a right to consider punitive damages.  Here, evidence shows that Michelin violated its own tolerance limits, produced tires with abnormalities that it knew constituted defects, made a deliberate decision to invest less in the manufacture of each tire, made a deliberate design decision not to add an important safety feature, and ignored what it knew about its failing tires.  If twelve citizens decide to "deter such conduct," they have a right to do so.  *See Hosp. Auth. of Gwinnett County v. Jones*, 261 Ga. 613, 615 (1991).

Respectfully submitted, this 26th day of October, 2011.

s/ Leigh Martin May
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
GEORGE W. FRYHOFER III
  Georgia Bar No. 279110
LEIGH MARTIN MAY
  Georgia Bar No. 473389
J.E. BUTLER III
  Georgia Bar No. 116955
Attorneys for Plaintiffs
Butler, Wooten & Fryhofer, LLP
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
E-mail: jim@butlerwooten.com
E-mail: george@butlerwooten.com
E-mail: leigh@butlerwooten.com
E-mail: jeb@butlerwooten.com


s/ Gary M. Shapiro
GARY M. SHAPIRO
  Georgia Bar No. 637794
Attorney for Plaintiffs
Law Offices of Gary M. Shapiro
400 Galleria Parkway, Suite 1500-20
Atlanta, Georgia 30339
(770) 817-1444
E-mail: shapirolaw@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2011, I electronically filed PLAINTIFFS' RESPONSE TO MICHELIN NORTH AMERICA INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT (REDACTED VERSION) with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Robert P. Monyak, Esq.  
Bonnie M. Lassiter, Esq.  
Peters & Monyak, LLP  
One Atlanta Plaza, Suite 2275  
950 East Paces Ferry Road NE  
Atlanta, GA 30326  

Richard K. Hines, V, Esq.  
Elizabeth C. Helm, Esq.  
Nelson Mullins  
Atlantic Station  
201 17th Street NW, Suite 1700  
Atlanta, GA 30363  

Susan A. Cahoon, Esq.  
Kilpatrick Townsend & Stockton LLP  
1100 Peachtree Street NE, Suite 2800  
Atlanta, GA 30309  

s/ Leigh Martin May
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
GEORGE W. FRYHOFER III
  Georgia Bar No. 279110
LEIGH MARTIN MAY
  Georgia Bar No. 473389
J.E. BUTLER III
  Georgia Bar No. 116955

Butler, Wooten & Fryhofer, LLP  
2719 Buford Highway  
Atlanta, Georgia 30324  
(404) 321-1700  
E-mail: jim@butlerwooten.com  
E-mail: george@butlerwooten.com  
E-mail: leigh@butlerwooten.com  
E-mail: jeb@butlerwooten.com